FILED

2016 Mar-09  PM 03:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| DE CHU CHRISTOPHER TANG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CASE NO.  2:13-CV-0401-SLB** |
| | ) | |
| VAXIN, INC.; WILLIAM J. ENRIGHT, | ) | |
| | ) | |
| Defendants. | ) | |
| | | |
| VAXIN, INC.; WILLIAM J. ENRIGHT, | ) | |
| | ) | |
| Counter Claimants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DE CHU CHRISTOPHER TANG, | ) | |
| | ) | |
| Counter Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on defendants' Motion for Partial

Dismissal of Second Amended Complaint, (doc. 63),[1] and their Renewed Motion for Partial

Summary Judgment, (doc. 73).  Plaintiff De-chu Christopher Tang has sued his former

employer, Vaxin, and Vaxin's Chief Executive Officer, William J. Enright, alleging a

number of claims arising from plainitff's employment with Vaxin and his termination.  Upon

consideration of the record, the submissions of the parties, and the relevant law, the court is

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

of the opinion that defendants' Motion for Partial Dismissal of the Second Amended Complaint, (doc. 63), is due to be granted in part and denied in part, and their Renewed Motion for Partial Summary Judgment, (doc. 73), is due to be granted.

## I.  MOTION FOR PARTIAL DISMISSAL
## OF SECOND AMENDED COMPLAINT

### A.  MOTION TO DISMISS STANDARD

Defendants has moved to dismiss plaintiff's Second, Third, and Fourth Causes of Action, set forth in his Second Amended Complaint, for failure to state a claim upon which relief can be granted.  (Doc. 63 at 3.)  The purpose of such a motion, authorized by Rule 12(b)(6) of the Federal Rules of Civil Procedure, is to test the facial sufficiency of the plaintiff's statement of a claim for relief.  *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1367 (11th Cir. 1997).  Rule 12(b)(6) must be read together with Rule 8(a)(2) of the Federal Rules of Civil Procedure, which "requires that a pleading contain a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1288 (11th Cir. 2010) (internal citations and quotation omitted).

When addressing a 12(b)(6) motion to dismiss, the court accepts the allegations in the complaint as true and construes those allegations in the light most favorable to plaintiff. *Ironworkers Local Union 68 v. AstraZeneca Pharmaceuticals, LP*, 634 F.3d 1352, 1359 (11th Cir. 2011)(quoting *Am. Dental Ass'n*, 605 F.3d at 1288).  To survive a Motion to

2

Dismiss, "the complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Id*. (quoting *Am. Dental Ass'n*, 605 F.3d at 1289 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)))(internal quotations omitted).  A claim is "plausible" if the facts are sufficient "to allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation," and the court does not assume that plaintiff can prove facts he has not alleged.  *Twombly*, 550 U.S. at 555, 563 n.8. (internal quotations and citations omitted). "[W]hile notice pleading may not require that the pleader allege a 'specific fact' to cover every element or allege 'with precision' each element of a claim, it is still necessary that a complaint 'contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001)(quoting *In re Plywood Antitrust Litig.*, 655 F.2d 627, 641 (5th Cir. Unit A Sept. 8, 1981)).

Plaintiff is proceeding pro se.  "*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and are liberally construed." *Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015)(internal citations and quotations omitted).   "[A] pro se complaint still must state a claim upon which the Court can grant relief." *Graveling v. BankUnited N.A.*, 970 F. Supp. 2d 1243, 1248 (N.D. Ala. 2013)(internal quotations omitted), *aff'd* No. 14-15198, 2015 WL 6847947 (11th Cir. Nov. 9, 2015).  Also, "'procedural rules

3

in ordinary civil litigation' should not be interpreted 'so as to excuse mistakes by those who proceed without counsel.'  Furthermore, a court must not act as de facto counsel for pro se parties or rewrite a deficient pleading." *Ferentinos v. Kissimmee Util. Auth.*, 604 Fed. Appx. 808, 809 (11th Cir. 2015)(quoting *McNeil v. United States,* 508 U.S. 106, 113 (1993), and citing *GJR Invs., Inc. v. Cnty. of Escambia,* 132 F.3d 1359, 1369 (11th Cir.1998), *overruled on other grounds as recognized in Randall v. Scott,* 610 F.3d 701, 709 (11th Cir.2010))(internal citations omitted).[2]

## B.  STATEMENT OF FACTS[3]

Plaintiff De-chu Christopher Tang is a United States citizen, who immigrated from Taiwan in 1979.  (Doc. 55 ¶ 7.)  He is the scientific founder of Vaxin.  (*Id*. ¶1.)  Vaxin did business in Birmingham, Alabama, from 1997 until 2012.  (*Id*. ¶ 3)  During Dr. Tang's employment with Vaxin, he served as Vice President of Research and Chief Technical Officer.  (*Id*. ¶ 1.)  Defendant William Enright became Vaxin's Chief Executive Officer in 2008.  (*Id*. ¶ 4.)  Enright is not a scientist.  (*See id*. ¶ 26.)

---

[2]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it.  ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***."  11th Cir. R. 36-2 (emphasis added).

[3]For purposes of the Statement of Facts, the court has accepted the allegations in the Second Amended Complaint as true and has construed those allegations in the light most favorable to plaintiff.  *See AstraZeneca Pharmaceuticals*, 634 F.3d at 1359.  The court has also considered Dr. Tang's Affidavit, doc. 56, which is referenced in his Second Amended Complaint, (*see* doc. 55 ¶¶ 21, 28, 33).

4

Vaxin is principally funded by governmental contracts, which "represent[ ] taxpayer money dedicated to advancing technology."[4]  (*Id*. ¶ 18.) Vaxin was also funded by a grant from a private foundation, and this grant was withdrawn after Dr. Tang's discharge.  (*Id*. ¶19.)  He contends that the loss of this grant was because Vaxin had "failed to achieve milestones."  (*Id*.)  In support of this statement he cites to a letter from Enright to Vaxin shareholders in 2014.  (*Id*.)  This letter states, "Despite the identification of several encouraging vaccine candidates in our screening studies, the Found Animal Foundation decided not to fund year 3 of our grant.  They felt the data from our screening studies did not warrant testing in the target species (dogs and cats)."  (Doc. 55-1 at 21.)  Dr. Tang alleges the loss of this funding, which he contends resulted from Vaxin and Enright's mismanagement, was a breach of fiduciary duty owed to shareholders.  (Doc. 55 ¶19.)  According to plaintiff, defendants' "mismanagement transformed Vaxin from an innovation powerhouse into [a] patent troll."  (*Id*. ¶ 20.)

During his employment with Vaxin, Dr. Tang was responsible for many inventions that became part of Vaxin's "core values," and he brought in more than $30 million in federal funding for the company as the "Principal Investigator" on 19 grants and contracts over a period of 14 years.  (*Id*. ¶ 6.)

---

[4]Dr. Tang contends, "As Defendants hired attorneys against Plaintiff, it is ***conceivable*** that Defendants [could] have abused taxpayer money by diverting government resources to litigation for hurting the Inventor as well as technology."  (Doc. 55 ¶ 18.)

Dr. Tang testified, "In March 2012, Enright suddenly squeezed Plaintiff out of Vaxin without warning.  Enright told Plaintiff bluntly and coldly that Plaintiff had to leave Vaxin immediately without any rights on the DVD patent.  Enright will develop DVD by himself without the Inventor." (Doc. 56 ¶ 20.)  In an email dated March 13, 2012, and addressed to a Vaxin Board Member, Dr. Tang wrote, "When Bill fired me ***today***, he told me coldly that the RAPIT technology shall be developed under his belt and I will have to leave without any rights." (*Id*. ¶ 14 [emphasis added].)  Dr. Tang alleges:

> [T]here was not a rule at Vaxin that the CEO could fire the CTO [Chief Technical Officer]; nor a rule that the Founder could fire the CEO.  The Board ought to be the only party where such decisions could be made.  It is conceivable that the CEO (Enright) made a unilateral decision to fire the CTO (Plaintiff) without authorization granted by the Board, and Enright subsequently forced the Board to accept the outcome after squeezing Plaintiff out.

(Doc. 55 ¶ 14.)  A member of the Board told Dr. Tang that he was unaware of Enright's decision to terminate his employment before it was made; other members of the board were "silent on the issue." (*Id*.)

After his termination, Vaxin refused to pay Dr. Tang his deferred salary and job expenses.  (*Id*. ¶ 8.)  Dr. Tang contends that Vaxin had the ability to pay these amounts because of a $21 million contract awarded to the company in 2011.  (*Id*.)

Before his discharge, Dr. Tang had been awarded a travel grant to attend a conference in Shanghai, China in 2012.  (*Id*. ¶ 15.)  Enright told Dr. Tang, "[A]ll the good conferences could be found in America or Europe," and told Dr. Tang not to attend the conference.  (*Id*.)

6

Dr. Tang alleges that Enright's comment "insulted all Asians . . . because Enright [had] ignored the fact that many Asian scientists had made great contributions to benefitting the world," and "[a]s an Asian American, [he] was offended by Enright's naked brutality of racial discrimination." (*Id.*)  Also, "Plaintiff told Enright that it was an honor to win the travel grant which was highly competitive, and this international conference was world-class." (*Id.* ¶ 16.)

Dr. Tang alleges that, after his termination, Enright "hijacked Plaintiff's company email [account] . . . by blocking Plaintiff's access" to it. (*Id.*)  "Instead of shutting down Plaintiff's email account immediately, Enright maliciously kept it open for many months;" he replied to an email sent to Dr. Tang's Vaxin email account and attempted to have Dr. Tang's travel grant rescinded. (*Id.*)  His attempt was unsuccessful. (*See id.* [email from conference sponsor indicating that Enright had informed her that Dr. Tang was "no longer at Vaxin anymore" and seeking confirmation that he would still be presenting].)

Dr. Tang also alleges that Enright hacked his LinkedIn account by adding Vaxin's logo and an advertisement. (*Id.* ¶ 17.)  He states:

> The only possibility for a hacker to insert Vaxin's new logo and advertisement into Plaintiff's private LinkedIn account would be an unauthorized user who had access to both the new Vaxin logo and Plaintiff's computer in Vaxin's office before Plaintiff changed his LinkedIn password.  Please note that Enright was the only person who had access to both, since Vaxin's new logo was created by Enright who also kept Plaintiff's computer at Vaxin.

(*Id.*)

7

According to Dr. Tang, Enright "tricked" him into signing a personal guaranty for $100,000 of a $200,000 loan to Vaxin by the Regional Planning Commission of Greater Birmingham [RPC].  (*Id.* ¶ 9.)  Enright sent Dr. Tang an email on June 8, 2011, in which he stated:

> I copied you on a message to Lesley who will help make sure we get all the signatures we need on the RPC documents.
>
> I wanted to let you know that I am working on a larger loan than the $200K with RPC.  The Board did not feel it was fair to have you and I taking this risk and therefore agreed to offer a share of the company to investors that were willing to step up and take the risk.  We have had several investors step up to say that they would Guaranty our guaranty.  Right now AnC will guaranty up to $70K, Philip up to $50K, Alex Leath up to $50K, therefore our exposure is only $15K each.  I am talking to a few more investors as well.  If they will guarantee more, we may be able to get a larger loan from Service Bank to ensure we can make it until the anthrax award starts flowing.

(*Id.* ¶ 9.)  Dr. Tang alleges, "After Enright forced Plaintiff to leave Vaxin in March 2012, Plaintiff demanded Enright . . . extinguish Plaintiff's RPC loan guarantee because Plaintiff would not be associated with Vaxin if Enright's action to fire Plaintiff had been authorized by the Vaxin Board.   However, Enright adamantly refused releasing Plaintiff from obligations under the promissory note . . . saying 'It is your responsibility since you signed it.'"  (*Id.*)  He also alleges that none of the other investors identified in Enright's email had agreed to guaranty the RPC loan.  (*Id.*)  According to Dr. Tang –

> Enright tricked RPC into providing a loan; and tricked Plaintiff into taking the financial responsibility as a loan guarantor in support of Vaxin's business within the state of Alabama without letting RPC and Plaintiff know that he was secretly planning to move Vaxin from Alabama to Maryland where his

home was, as shown by his secret action in identifying laboratory and office
space in Maryland under the radar.

(*Id*. ¶ 10.)  "As a consequence, Plaintiff was caught helplessly in Enright's trap as a victim

under false premises."  (*Id*. ¶ 9.)

On March 31, 2013, Dr. Tang, with the assistance of counsel, filed a Complaint

against Vaxin and Enright.  (Doc. 1.)  This Complaint was superseded by an Amended

Complaint, also filed with the assistance of counsel.  (Doc. 14.)  This Amended Complaint

alleged the following causes of action against both Vaxin and Enright:  (1) violation of the

False Claims Act [FCA], (2) FCA retaliation, (3) § 1981 discrimination, (4) § 1981

retaliation, (5) breach of contract, (6) breach of implied-in-fact contract, and (7) unjust

enrichment.  He alleged the following causes of action against Enright:  (1) fraudulent

inducement, (2) and breach of fiduciary duty.    Defendants filed a Motion for Partial

Dismissal of Amended Complaint, in which they moved to dismiss "the claims under the

False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., the retaliation claims under 42 U.S.C.

§ 1981 and the claims of fraud and breach of fiduciary duty."  (Doc. 19 at 1.)

The court granted defendants' Motion for Partial Dismissal.  (Doc. 46.)  In its Order,

the court held:

> 1.  Plaintiff's claims for violation of the FCA against both defendants
> and FCA retaliation against Enright are **DISMISSED WITH PREJUDICE**.
>
> 2.  Plaintiff is **GRANTED** leave to amend his complaint to sufficiently
> state a claim for relief on the other counts defendant moved to dismiss.  Should
> he choose to do so, he should file one completely-integrated amended
> complaint. . . .

(*Id.*)

In response to this Order, Dr. Tang, now proceeding pro se, filed a Second Amended Complaint.  (Doc. 55.)  In this Second Amended Complaint, Dr. Tang set forth four causes of action:  "First Cause of Action: Alleged Robbery of Plaintiff's Salaries and Job Expenses by Defendants;" "Second Cause of Action: Intentional Harm of Plaintiff by Defendants;"[5] "Third Cause of Action:  Alleged Deception of Board Members by Enright;" and "Fourth Cause of Action:  Enright As An Alleged Computer Hacker."  (*Id*. ¶¶ 32-35.)

Defendants have moved to dismiss the Second, Third, and Fourth Causes of Action, as well as claims set forth in his First Amended Complaint that were not included in his Second Amended Complaint.

---

[5]The Second Cause of Action contains a number of subclaims:

Defendants intentionally harmed Plaintiff by i) robbing patent rights (to be filed in an affidavit), deferred salaries, job expenses, government grants/contracts, documents, laboratory equipment, biological samples, and trained personnel from Plaintiff; ii) firing Plaintiff without showing Board's authorization, without warning, and without reasons; iii) forcing Plaintiff to keep his responsibility as an RPC loan guarantor with the risk of being sued by RPC after firing Plaintiff; iv) hijacking Plaintiffs email's and hacking Plaintiff's accounts; v) violating Defendants' fiduciary duty by hurting the development of a beneficial technology and losing ongoing grant support.

(Doc. 55 ¶ 33.)

## C.  DISCUSSION[6]

### 1.  CLAIMS NOT ASSERTED IN THE SECOND AMENDED COMPLAINT

In its March 31, 2015 Order and Memorandum Opinion, (doc. 45), the court granted defendants' Motion for Partial Dismissal of Amended Complaint (Doc. 19), and dismissed with prejudice plaintiff's claims for FCA violations against defendants and his claim of retaliation under the FCA against Enright.  It allowed plaintiff leave to amend his Complaint, if he could, to properly state claims for relief based on FCA retaliation against Vaxin, § 1981 retaliation against defendants, fraudulent inducement against Enright, and breach of fiduciary duty against Enright.  (Doc. 45)  In its memorandum opinion, the court identified specific deficiencies for plaintiff to address in any amended complaint, and it ordered him to include all his claims in one completely-integrated amended complaint. (*Id*.)  The court's Order stated, "Plaintiff is **GRANTED** leave to amend his complaint to sufficiently state a claim for relief on the other counts defendant moved to dismiss.  Should he choose to do so, he should file one completely-integrated amended complaint." (Doc. 46.)  Plaintiff filed a Second Amended Complaint; however, this Amended Complaint did not include claims for FCA retaliation, § 1981 discrimination and retaliation, unjust enrichment, fraudulent inducement against Enright, and minority shareholder oppression.

---

[6]At oral argument on the Motion to Dismiss addressed in this Opinion, the court expressed its view that plaintiff could proceed with three claims.  On further review of the record and the law, the court concludes, for the reasons set forth herein, that plaintiff may only proceed with his claim for unpaid deferred salary and unpaid business expenses.

> [T]he Eleventh Circuit has made it clear that an amended pleading supersedes entirely (*i.e.,* supplants) the pleading that it amends.   *See Pintando v. Miami–Dade Hous. Agency,* 501 F.3d 1241, 1243 (11th Cir. 2007)("[A]n amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary." (quoting *Dresdner Bank AG v. M/V Olympia Voyager,* 463 F.3d 1210, 1215 (11th Cir.2006))); *Lowery v. Ala. Power Co.,* 483 F.3d 1184, 1219 (11th Cir. 2007)("Under . . . federal law, an amended complaint supersedes the initial complaint and becomes the operative pleading in the case.").

*Jones Creek Inv'rs, LLC v. Columbia Cty.*, No. CV 111-174, 2011 WL 7446782, at *5 (S.D. Ga. Dec. 9, 2011), *report and recommendation adopted*, No. CV 111-174, 2012 WL 694316 (S.D. Ga. Mar. 1, 2012); *see also Kaloe Shipping Co. v. Goltens Serv. Co.*, 315 Fed. Appx 877, 879 (11th Cir. 2009)("An amended pleading supersedes the former pleading; the original pleading is abandoned by the amendment, and is no longer a part of the pleader's averments against his adversary." (quoting *Dresdner Bank AG v. M/V Olympia Voyager,* 463 F.3d 1210, 1215 (11th Cir. 2006)); *Hooper v. City of Montgomery*, No. CIVA 2:06CV612-ID, 2007 WL 2069851, at *2 (M.D. Ala. July 17, 2007)(quoting *Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1517 (10th Cir. 1991)("an amended complaint ordinarily supersedes the original and renders it of no legal effect").

At the hearing on defendants' First Motion to Dismiss and in its Order granting that Motion, the court specifically told plaintiff that, if he filed an amended complaint, that complaint must include all his claims.  Plaintiff's Second Amended Complaint does not include some of the claims set forth in his prior Amended Complaint.  Therefore, these

claims – FCA retaliation, § 1981 discrimination and retaliation,[7] unjust enrichment, fraudulent inducement against Enright,[8] minority shareholder oppression – will be dismissed with prejudice.   Therefore, the claims of retaliation under the FCA and § 1981, race discrimination under § 1981, unjust enrichment, and minority shareholder oppression alleged in the first amended complaint, but not in the second amended complaint, are no longer alleged in this action.

## 2. "SECOND CAUSE OF ACTION:  INTENTIONAL HARM OF PLAINTIFF BY DEFENDANTS"  (Doc. 55 ¶ 33.)

Plaintiff's Second Cause of Action contains a number of distinct and separate causes of action, linked only by plaintiff's allegation that these acts of the defendants caused him injury.   The court will address these claims as separate causes of action.

### a.  Misappropriation of Patent Rights

Defendants contend that Dr. Tang "has failed to allege specific facts to plausibly show that he had any rights to any [patent rights] or that Defendants deprived him of them in a way that would establish a claim for relief."  (Doc. 63 at 3.)  As stated at the hearing, the court finds sufficient facts are set forth in the Second Amended Complaint, (doc. 55), and the

---

[7]The court notes that plaintiff's Second Amended Complaint alleges Enright "insulted all Asians" when he told plaintiff that "all good conferences could be found in America and Europe." (Doc. 55 ¶ 15.)  However, unlike his First Amended Complaint, plaintiff does not assert a cause of action for discrimination and retaliation on the basis of race in violation of § 1981.  (*Compare* doc. 55 *with* doc. 14 ¶¶ 25-27, 66.)

[8]This claim in plaintiff's First Amended Complaint was based on plaintiff's guaranty of the RPC loan.  Had this claim been included in plaintiff's Second Amended Complaint, it would be due to be dismissed as moot.  See, *infra*, p. 21.

affidavit in opposition to defendant's motion for Partial Summary Judgment, (doc. 56), to state a claim for relief.  Therefore, defendants' Motion to Dismiss will be denied as to plaintiff's Second Cause of Action to the extent it is based on misappropriation of Dr. Tang's patent rights.

However, for set forth below, the court finds, based on defendants' Renewed Motion for Partial Summary Judgment, that this claim is due to be dismissed.

### b. Wrongful/Unauthorized Termination

Dr. Tang alleges that defendants intentionally harmed him by "firing Plaintiff without showing [the] Board's authorization, without warning, and without reasons." (Doc. 55 ¶ 33.) Defendants contend that Dr. Tang was an at-will employee and, therefore, defendant Enright could fire him at any time and without reason.  (Doc. 63 at 6-7.)  They allege:

> In his Second Amended Complaint, Plaintiff has not alleged any facts to show that his employment with Vaxin was anything other than "at will" or that Vaxin was not able to terminate his employment at any time for any reason.  Plaintiff has also not alleged that his employment could not be terminated without warning or authorization from Vaxin's Board of Directors. While Plaintiff alleges that the Board of Directors "ought" to have been the only party with the authority to terminate him, he does not allege that Enright could not actually discharge him without Board approval.  For these reasons, Plaintiff has failed to allege a claim of wrongful termination under his Third Cause of Action.

(*Id*. at 7.)  In response to the Motion for Partial Dismissal, Dr. Tang contends that "Defendants designed a scheme to intentionally harm Plaintiff from a variety of angles." (Doc. 66 at 1.)  With regard to his termination, he states:

> In March 2012, Enright suddenly squeezed Plaintiff out of Vaxin with neither reason nor warning.  Enright told Plaintiff that he had been authorized by the Vaxin Board to fire Plaintiff.  Vaxin's Board member Dr. Ike Lee told Plaintiff the next day that he was unaware of this decision in advance.  Evidence shows that Enright fired Plaintiff without Board's authorization and Enright had no legal rights to do so.  Disruption of Plaintiffs productive career unlawfully and wrongfully is part of the scheme to intentionally harm Plaintiff.

(*Id*. at 2.)  He also contends, "Since Enright fired Plaintiff with neither reason nor warning, it is Enright's duty to disclose legitimate documents showing that he has the legal rights to do so."  (Doc. 66 at 6.)  He sets forth a number of items he contends defendants must show to prove he was not illegally terminated:

> To prove that Enright's decision to fire Plaintiff was authorized by Board, Defendants must disclose the official record of the Board meeting showing i) all the Board members were officially notified of the Board meeting at [least] 24 hours in advance; ii) the majority of Board members were present at the meeting; iii) the majority of Board members supported Enright's motion to fire Plaintiff at the meeting.  Without the official record of the Board meeting, Enright's act to fire Plaintiff is illegal and Defendants must compensate Plaintiff for lost income and other damages inflicted by Enright.

(*Id*. at 7.)

The Supreme Court of Alabama has described the law in Alabama:

> It has long been the law in Alabama that employment is terminable at will by either party for any reason unless there is an express and specific contract for lifetime employment or employment for a specific duration. "[A]bsent an agreement on a definite term, any employment is considered to be 'at-will,' and may be terminated by either party, with or without cause or justification." *Clark v. America's First Credit Union,* 585 So. 2d 1367, 1369 (Ala.1991).  Furthermore, ***employees in Alabama bear a heavy burden of proof*** to establish that an employment relationship is other than "at will."  The law considers lifetime or permanent employment contracts to be extraordinary and not lightly to be implied. *Alabama Mills, Inc. v. Smith,* 237 Ala. 296, 301, 186 So. 699, 704 (1939).

*Howard v. Wolff Broad. Corp.*, 611 So. 2d 307, 310-11 (Ala. 1992)(emphasis added). Therefore, to state a claim for relief based on his termination, ***plaintiff***, and not defendants, must allege that his employment relationship with Vaxin was "other than 'at will.'" *Id*. He has not alleged any express or specific contract with Vaxin providing that he could not be terminated by the President and CEO and/or providing that only the Board of Directors could terminate him. His Second Amended Complaint contains little information about the formation of his employment relationship with Vaxin, except to state, without elaboration, that he founded Vaxin and he could only be fired by the Board. (Doc. 55 ¶ 2 ["Plaintiff is Vaxin's Scientific Founder . . . ."], ¶ 3 ["Defendant Vaxin is a corporation founded by Plaintiff . . . ."], ¶ 14 ["Please note that there was not a rule at Vaxin that the CEO could fire the CTO; nor a rule that the Founder could fire the CEO."], ¶ 26 ["Board authorization was essential to fire a CTO who is also Vaxin's Founder and the DVD Inventor."]; *see also* doc. 66 at 13 [article noting "Dr. Tang founded the company Vaxin Inc. in 1997, for which he served as board member (1997-1999), [and] Vice President of Research and Chief Scientific Officer (1997-2012)"].) Without allegations of facts to support a legal right to continued employment, termination only for cause, and termination only by the Board, plaintiff has not stated facts sufficient to overcome the presumption that he was an at-will employee, who could be terminated by Enright, as President and CEO, at any time and for any, or no, reason, except for certain unlawful reasons not at issue in this case.

16

Plaintiff's Second Cause of Action based on his alleged wrongful termination is due to be dismissed.

### c. Unpaid Deferred Salary and Expenses

Dr. Tang's First Cause of Action is based on defendants' "alleged robbery" of plaintiff's salary and job expenses. (Doc. 55 ¶ 31.) To the extent his Second Cause of Action also contains a claim based on defendants' robbery of Dr. Tang's "deferred salaries" and "job expenses," this claim is due to be dismissed as redundant. *See* Fed. R. Civ. P. 12(f)("The court may strike from a pleading . . . any redundant . . . matter."); *see Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991).

Therefore, plaintiff's Second Cause of Action, to the extent it contains a claim for unpaid salary and job expenses, is due to be dismissed.

### d. Misappropriated Government Grants and Contracts

As part of his Second Cause of Action, plaintiff alleges that "Defendants intentionally harmed Plaintiff by . . . robbing . . . [him of] government grants [and] contracts, documents, laboratory equipment, biological samples, and trained personnel." (*Id*. at ¶ 33.)   In his Second Amended Complaint, he alleges:

> 6. Plaintiff brought in more than $30 million of federal funding for Vaxin as the Principal Investigator (PI) on 19 grants and contracts over 14 years (EXHIBIT 1).
>    . . .
>
> 18. Per Enright's letter to Vaxin shareholders in 2014, Vaxin had been principally supported by a government contract (EXHIBIT 5).  . . .

17

19.   Although Vaxin was also supported by a grant from a private Foundation when Plaintiff was squeezed out of Vaxin, this grant was subsequently withdrawn by the Foundation because Defendants failed to achieve the milestones (EXHIBIT 5).  Please note that it is very unusual for a funding agency to withdraw an awarded grant before the work is completed. . . .

     . . .

21.   Defendants intentionally harmed Plaintiff by . . . robbing . . . government grants/contracts, documents, laboratory equipment, biological samples, and trained personnel . . . .

(Doc. 55 ¶¶ 6, 18-19, 21.)   Defendants have moved to dismiss this claim because Dr. Tang "has failed to alleged specific facts to plausibly show that he had any rights to any [government grants or contracts, documents, laboratory equipment, biological samples, and trained personnel] or that Defendants deprived him of them in a way that would establish a claim for relief."  (Doc. 63 at 3.)  In response, Dr. Tang alleges:

Alleged robbery of grants and contracts
Defendants squeezed Plaintiff out of Vaxin when Plaintiff was the Principal Investigator (PI) and a Scientist on several grants/contracts.  Disruption of Plaintiff's ongoing work not only hurt Plaintiff's career but also Vaxin, as shown by BARDA's act to descope the contract (HHSO100201100032C) and the Found Animals Foundation's act to cancel the Michelson Grant (D0809-W24) after Plaintiff was squeezed out of Vaxin in March 2012. Defendants' act to take Plaintiff's grants and contracts away from Plaintiff with brute force[9] is part of the scheme to intentionally harm Plaintiff.

Alleged robbery of documents
As the PI at Vaxin over 14 years, Plaintiff and his associates had generated a large number of documents which represent one of the bedrocks in support of Vaxin's value chain.  Many of the documents can only be understood by

---

[9]There is no allegation that defendants used "brute force," defined as great physical force or strength, against plaintiff at any time.

Plaintiff.  Defendants' act to take the documents away from Plaintiff with brute force confers a pernicious impact on Vaxin's value; it is also part of the scheme to intentionally harm Plaintiff who made several firsts during development of a new generation of vaccines that could [inure] to benefit the society (EXHIBIT 1).

Alleged robbery of equipment
The majority of laboratory equipment at Vaxin in Birmingham, Alabama was purchased with funds raised by Plaintiff and his associates before Enright showed up.  Enright came to Vaxin with no vision, no technology, no money, no equipment.  All the equipment purchased by Plaintiff and his associates was moved to Maryland by Enright in April 2012.  Defendants' act to take resources away from Plaintiff with brute force is part of the scheme to intentionally harm Plaintiff.

Alleged robbery of biological samples
The majority of biological samples at Vaxin in Birmingham, Alabama were generated by Plaintiff and his associates, and most of the samples can only be identified by Plaintiff.  Defendants' act to take biological samples away from Plaintiff with brute force confers a pernicious impact on Vaxin's value; it is also part of the scheme to intentionally harm Plaintiff who made several firsts during development of a new generation of vaccines that could endure to benefit the society (EXHIBIT 1).

Disassociation of trained personnel from Plaintiff
Plaintiff has trained many personnel during his tenure at Vaxin over 14 years.  Most of them moved on to a higher ground elsewhere; only two Scientists stayed with Plaintiff in March 2012.  It is [alright] for Enright to hire them under his control if Enright could provide them with a supportive environment to grow; however, there is no evidence that a supportive environment exists after Vaxin was moved to Maryland.  To disassociate trained personnel from Plaintiff is part of the scheme to intentionally harm Plaintiff.

(Doc. 66 at 2-3 [footnote added].)

   The court finds that Dr. Tang's allegations of robbery are best interpreted as a claim

of common-law conversion of the grants/contracts, documents, laboratory equipment, and

biological samples.  His claim of disassociation is best interpreted as a claim of interference with business relations.

### i. Conversion

In Alabama –

> To prove conversion, [plaintiffs] must present evidence of "a wrongful taking or a wrongful detention or interference, or an illegal assumption of ownership, or an illegal use or misuse." *Ott v. Fox,* 362 So. 2d 836, 839 (Ala.1978); *Huntsville Golf Dev., Inc. v. Ratcliff, Inc.,* 646 So. 2d 1334, 1336 (Ala.1994).  The [plaintiff] "must establish that the [defendants] converted specific **personal** property to [their] own use and beneficial enjoyment." *Huntsville Golf,* 646 So. 2d at 1336.

*Ex parte Anderson*, 867 So. 2d 1125, 1129 (Ala. 2003)(emphasis added).  Dr. Tang's Second Amended Complaint does not allege that defendants deprived him of his **personal** property. Rather he argues that the grants, documents, equipment and samples were obtained or created while he worked as an employee for Vaxin.  As such, these things belong to Vaxin and not to plaintiff personally.

Therefore, plaintiff's Second Cause of Action is due to be dismissed to the extent he alleges Vaxin stole grants/contracts, documents, biological samples, and equipment.

### ii. Wrongful Interference with Business Relations

In Alabama, the elements of the tort of wrongful interference with business relations are:  (1) the existence of a protectable business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.  *White Sands Grp., L.L.C. v. PRS II, LLC,* 32 So. 3d 5, 14 (Ala.

2009).  In his opposition to defendants' Motion to Dismiss, plaintiff alleges that this claim

is based on his "disassociation" from two scientists, employed by Vaxin, with whom he had

worked before his termination.  (Doc. 66 at 2.)  Clearly, plaintiff's relationship with his co-

workers is based on his employment by Vaxin.  Vaxin and Enright are not "strangers" to this

business relationship; they are parties to the business relationship.  And, "a party to a

business relation cannot be held liable for interference with that relation."  *Williams v. A.L.*

*Williams & Associates, Inc.*, 555 So. 2d 121, 124 (Ala. 1989)(citing *Harrell v. Reynolds*

*Metals Co.*, 495 So. 2d 1381, 1388 (Ala. 1986)).

Therefore, plaintiff's Second Cause of Action, to the extent it alleges a claim of

interference with business relations, is due to be dismissed.

### e.  Failure to Free Plaintiff from Personal Guaranty for Vaxin Loan

Defendant Vaxin has paid off its loan to the Regional Planning Commission.

Therefore, defendants' Motion to Dismiss Dr. Tang's Second Cause of Action to the extent

based on his personal guaranty of this loan will be denied as moot.

### f.  Hijacking Plaintiff's Emails and Hacking Plaintiff's LinkedIn Account

Dr. Tang's Second Amended Complaint alleges the following:

15.  When Plaintiff was awarded a travel grant from IBC Asia to attend
an international conference in Shanghai in 2012[,] . . . Enright instructed
Plaintiff not to attend this meeting by saying "All the good conferences could
be found in America or Europe." . . .

16.  Plaintiff told Enright that it was an honor to win the travel grant
which was highly competitive, and this international conference was
world-class.  When Enright fired Plaintiff in March 2012, he immediately

hijacked Plaintiff's company email tang@vaxin.com by blocking Plaintiff's access.  Instead of shutting down Plaintiff's email account immediately, Enright maliciously kept it open for many months to trap any correspondence to Plaintiff after Plaintiff was squeezed out of Vaxin.  Without any decency, Enright responded to Plaintiff's email without Plaintiff's permission behind Plaintiff's back and allegedly instigated the Shanghai conference to cancel Plaintiff's travel grant . . . .

. . .

17.    Moreover, Plaintiff's private LinkedIn account was hacked as shown below.  The only possibility for a hacker to insert Vaxin's new logo and advertisement into Plaintiff's private LinkedIn account would be an unauthorized user who had access to both the new Vaxin logo and Plaintiff's computer in Vaxin's office before Plaintiff changed his LinkedIn password.  Please note that Enright was the only person who had access to both, since Vaxin's new logo was created by Enright who also kept Plaintiff's computer at Vaxin.

(Doc. 55 ¶¶ 15-17.)

Defendants argue that plaintiff's allegation that his email and LinkedIn accounts were "hacked" fails to state a claim because plaintiff's Second Amended Complaint alleges that the email account that defendants blocked and accessed was a Vaxin email account.  In response, plaintiff contends:

After squeezing Plaintiff out of Vaxin in March 2012, Enright immediately blocked Plaintiff's access to Plaintiff's email account at Vaxin.  Evidence shows that Enright hacked Plaintiff's email account; identified an email from a Shanghai conference to invite Plaintiff as a funded speaker; and subsequently instigated the conference to cancel the hard-to-win travel grant in support of Plaintiff behind Plaintiff's back.  Evidence also shows that Enright allegedly hacked Plaintiffs personal LinkedIn account.  If Plaintiff's emails hijacked by Enright should be disclosed, it is conceivable that there may be other damages inflicted by Enright as part of the scheme to intentionally harm Plaintiff.

(Doc. 66 at 2-3.)

22

At the hearing on defendants' Motion to Dismiss, this court indicated that it was of the opinion that plaintiff's hacking claims stated a claim for invasion of privacy/wrongful intrusion.  The Alabama Supreme Court has held:

> In *Phillips v. Smalley Maintenance Services, Inc.,* 435 So. 2d 705 (Ala.1983), this Court adopted the *Restatement (Second) of Torts* definition of the wrongful-intrusion branch of the invasion-of-privacy tort:
>
>> "One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."
>
> *Restatement (Second) of Torts* § 652B (1977).  Comment c to § 652B states in part:  "The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs."  The wrongful intrusion may be by physical intrusion into a place where the plaintiff has secluded himself, by discovering the plaintiff's private affairs through wiretapping or eavesdropping, or by some investigation into the plaintiff's private concerns, such as opening private mail or examining a private bank account.  *Restatement (Second) of Torts* § 652B cm t. b; see *Vernars v. Young,* 539 F.2d 966 (3d Cir. 1976)(holding that invasion of privacy occurred when mail addressed to plaintiff was opened by defendant without plaintiff's consent); see generally, W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts,* § 117, at 854–55 (5th ed.1984); 62 Am. Jur. 2d *Privacy* §§ 51–57 (1990).  Further, if the means of gathering the information are excessively objectionable and improper, a wrongful intrusion may occur.  See *Hogin v. Cottingham,* 533 So. 2d 525 (Ala. 1988)(wrongful intrusion occurs when there has been abrupt, offensive, and objectionable prying into information that is entitled to be private).

*Johnston v. Fuller*, 706 So. 2d 700, 702 (Ala. 1997).   The tort of invasion of privacy/intrusion requires a plaintiff to allege and prove "[1] the intentional wrongful intrusion [2] into the [plaintiff's] ***private*** activities [3] in such a manner as to ***outrage or***

***cause mental suffering, shame, or humiliation to a person of ordinary sensibilities***." *Carter v. Innisfree Hotel, Inc.*, 661 So. 2d 1174, 1178 (Ala.1995)(citation omitted and emphasis added).  "One may invade another's privacy through either an intrusion upon a physical space, such as a trespass, or by an invasion of one's 'emotional sanctum'; the law prohibits a wrongful intrusion into either of these areas of privacy."  *Id*.

Upon further consideration, the court finds that plaintiff has not alleged sufficient facts to support an invasion of privacy claim.

The court notes that plaintiff bases his claim that defendants "hacked" his LinkedIn account upon the fact that the Vaxin logo was changed and an advertisement for Vaxin was included on his page.  (Doc. 55 ¶ 17.)  Whether changing the logo and adding the advertisement was an intentional intrusion by defendants or simply an operation of LinkedIn to change the logo and place the ad on all accounts affiliated with Vaxin is not clear.  (*See id*. [webshot of Dr. Tang's LinkedIn page].)  Nevertheless, Dr. Tang has not alleged that changing the appearance of the logo and/or placing the ad was done in a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

As to Dr. Tang's claim that defendants captured emails regarding the Shanghai conference, the court finds he has not alleged any outrage or shame to a person or ordinary sensibilities.  Dr. Tang alleges that Enright told the conference organizers that Dr. Tang was no longer an employee of Vaxin, which was true.  The conference organizers did not withdraw the travel grant and they did not cancel plaintiff's speaking engagement.  Under

these circumstances, the court finds Enright and Vaxin's actions regarding emails about the Shanghai conference were not done in such a manner as to "outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *See Carter*, 661 So. 2d at 1178.

Therefore, the court finds that defendants' Motion to Dismiss is due to be granted and Dr. Tang's Second Cause of Action, to the extent it  alleges defendants hijacked and/or hacked his Vaxin email account and his LinkedIn account, will be dismissed.

### g. Breach of Fiduciary Duty – Hurting the Development of a Beneficial Technology and Losing Ongoing Grant Support (Shareholder Derivative Claim)

In his Second Cause of Action, Dr. Tang alleges defendants "violat[ed their] fiduciary duty by hurting the development of a beneficial technology and losing ongoing grant support."  (Doc. 55 ¶ 33.)  He contends, "[M]any of the documents and biological samples could only be identified by Plaintiff.  Robbery of documents and biological samples away from Plaintiff had a pernicious impact on Vaxin's value, resulting in substantial professional and financial injuries to Vaxin shareholders including Plaintiff." (*Id*.) Defendants argue that this claim should be dismissed because "Plaintiff cannot assert a claim of breach of fiduciary duty against Vaxin or Enright for these types of injuries. . . .  Because the harm alleged by Plaintiff was to Vaxin, he has no standing or right to assert a claim for it."  (Doc. 63 at 5.)

Plaintiff did not address defendants' argument that he cannot bring a shareholder derivative claim.   In his opposition, plaintiff contends that "Defendants' scheme to

intentionally harm Plaintiff . . . supports Plaintiff's ***minority shareholder oppression***." (Doc.

66 at 8.)  A claim of "minority shareholder oppression" is distinct from a derivative claim,

which is brought on behalf of the corporation.  As the Alabama Supreme Court has held:

> The lost value of a minority shareholder's stock resulting from director
> self-dealing or mismanagement could certainly be characterized as "unfair" to
> the minority stockholder in some sense, but this is a quintessential derivative
> injury, merely incidental to one's status as a stockholder, and thus not a harm
> cognizable under a squeeze-out [or minority shareholder oppression] theory.
> A minority shareholder has a remedy for such an injury, but that remedy is a
> derivative action brought on behalf of the corporation.

*Altrust Fin. Servs., Inc. v. Adams*, 76 So. 3d 228, 244 (Ala. 2011)(internal citation and

quotation omitted).

Dr. Tang, who is not a lawyer, cannot pursue, pro se, a shareholder derivative action

on behalf of Vaxin.  *See Phillips v. Tobin*, 548 F.2d 408, 411-15 (2d Cir. 1976).  Therefore,

his Second Cause of Action to the extent it alleges a shareholder derivative claim will be

dismissed.

In its earlier Memorandum Opinion, the court noted that Dr. Tang's amended

complaint must necessarily contain allegations of fact that Vaxin was a close corporation and

Enright was a majority shareholder in order to state a claim based on minority shareholder

oppression.  (Doc. 45 at 18 n.13.)  Dr. Tang has failed to allege that Vaxin is a close

corporation and/or that Enright is the majority shareholder as necessary to state a minority

shareholder oppression claim.  Therefore, the court finds that claim will be dismissed.

### 3.  THIRD CAUSE OF ACTION:  ALLEGED DECEPTION OF BOARD MEMBERS BY ENRIGHT  (Doc. 55 ¶ 34.)

In the Third Cause of Action, Dr. Tang alleges that defendant Enright "fired [him] without authorization granted by the Board." (Doc. 55 ¶ 34.)  He alleges:

> After Enright fired Plaintiff in March 2012, Vaxin Board member Dr. Ike Lee told Plaintiff that he was unaware of Enright's decision to fire Plaintiff in advance; and other Board members were silent on this issue.  Please note that there was not a rule at Vaxin that the CEO could fire the CTO; nor a rule that the Founder could fire the CEO.  The Board ought to be the only party where such decisions could be made.  It is conceivable that the CEO (Enright) made a unilateral decision to fire the CTO (Plaintiff) without authorization granted by the Board, and Enright subsequently forced the Board to accept the outcome after squeezing Plaintiff out.

(*Id*. ¶ 14.)  Defendants contend, "Plaintiff's Third Cause of Action should be dismissed because Plaintiff has alleged no facts to establish that his employment was anything other than terminable 'at will' or that his employment could not be terminated without warning or authorization from Vaxin's Board of Directors." (Doc. 63 at 6.)  They argue:

> Plaintiff has also not alleged that his employment could *not* be terminated without warning or authorization from Vaxin's Board of Directors.  While Plaintiff alleges that the Board of Directors "ought" to have been the only party with the authority to terminate him, he does not allege that Enright could not actually discharge him without Board approval.  For these reasons, Plaintiff has failed to allege a claim of wrongful termination under his Third Cause of Action.

(*Id*. at 7.)

Plaintiff's Third Cause of Action, a claim for wrongful termination against defendant Enright personally, is due to be dismissed for the reasons set forth above.  See, *supra*, pp. 14-17.

27

### 4.   FOURTH CAUSE OF ACTION:   ENRIGHT AS AN ALLEGED COMPUTER HACKER (Doc. 55 ¶ 35.)

Dr. Tang alleges, "Enright hijacked Plaintiff's emails by blocking Plaintiff's access to his own emails, trapped Plaintiff's emails by keeping Plaintiff's email account open under his control for many months after firing Plaintiff, instigated a conference to cancel Plaintiff's travel grant by hacking Plaintiff's emails, and allegedly hacked Plaintiff's private LinkedIn account." (Doc. 55 ¶ 35.)  Defendants contend, "Plaintiff's [Fourth] Cause of Action should be dismissed because Plaintiff has alleged no facts to establish that Vaxin or Enright engaged in any conduct that would give rise to a claim for relief for "hacking" into his email account. The email account that Plaintiff complains that Enright or Vaxin "hacked" was a *Vaxin* account that it is reasonable to infer that the company had complete control over, and Plaintiff has not alleged any facts to plausibly suggest otherwise."  (Doc. 63 at 7-8.)

Plaintiff's Fourth Cause of Action, a claim for computer hacking against defendant Enright personally, is due to be dismissed for the reasons set forth above.  See, *supra*, pp.21-25.

## D.  CONCLUSION

For the foregoing reasons, the court is of the opinion that defendants' Motion for Partial Dismissal of Second Amended Complaint, (doc. 63), is due to be granted in part and denied in part.  The Motion is due to be denied as to plaintiff's claim alleging theft of his patent rights to the DVD technology and denied as to the claims based on his guaranty of the RPC loan; his claims based on the guaranty of RPC loan will be dismissed moot.  The

Motion to Dismiss is granted as to the remaining claims set forth in the Second, Third, and Fourth Causes of action and as to those claims, set forth in the First Amended Complaint that were not included in the Second Amended Complaint.  An Order grsnting in  part and denying in part defendants' Motion for Partial Dismiss of Second Amended Complaint, (doc. 63), will be entered contemporaneously with this Memorandum Opinion.

## II.  RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT

### A.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A)  citing to particular parts of materials in the record,  including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)).  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## B.  STATEMENT OF FACTS

According to defendant Enright, defendant Vaxin "is an emerging biotechnology company engaged in the business of developing vaccines, biological products and proprietary technology for the non-invasive delivery of vaccines to illicit immune responses to diseases

30

like influenza, anthrax, and Avian influenza." (Doc. 76-1 ¶ 3.) Plaintiff was "Vaxin's Scientific Founder and was the Vice President (VP) of Research and Chief Technical Officer (CTO) during his tenure at Vaxin in Birmingham, Alabama (1997-2012)." (Doc. 56 ¶ 2.)

On November 1, 2001, Plaintiff signed and entered into another Employee Innovation, Non-Competition and Non-Solicitation Agreement (the "Agreement") with Vaxin, Inc.[10] (Doc. 76-3 at 2, 5.) By signing the agreement, plaintiff agreed to the following:

As a condition of employment by Vaxin, Inc. ("Vaxin") and other good and valuable consideration, the receipt and sufficiency of which I hereby acknowledge, I acknowledge and agree that:

1. Proprietary Information. My employment creates a relationship of confidence and trust between Vaxin and me with respect to any information (a) applicable to Vaxin's business; or (b) applicable to the business of any client or customer of Vaxin, which may be made known to me by Vaxin or by any client or customer of Vaxin, or learned by me in such context during the period of my employment. All such information has commercial value in the business in which Vaxin is engaged and is hereinafter called "Proprietary Information." By way of illustration but not limitation, Proprietary Information includes any and all technical and non-technical information, including financial information, procurement requirements, customer lists, business forecasts, sales and merchandising[,] and marketing plans and information. "Proprietary Information" also includes proprietary or confidential information of any third party who may disclose such information to Vaxin or to me in the course of Vaxin's business.

2. Ownership and Nondisclosure of Proprietary Information. All Proprietary Information is the sole property of Vaxin, Vaxin's assigns and Vaxin's customers. Vaxin, Vaxin's assigns and Vaxin's customers will be the sole and exclusive owner of all patents, copyrights, mask works, trade secrets and other rights in the Proprietary Information. **I hereby do and will assign**

---

[10]Plaintiff had previously signed a similar agreement in 1999 when defendant Vaxin was known as Vaxin Pharmaceuticals, Inc. (*See* doc. 76-2 at 2, 7.)

***to Vaxin all rights, title, and interest I may have or acquire in the Proprietary Information***.  At all times, both during my employment by Vaxin and after termination of such employment, I will keep in confidence and trust all Proprietary Information, and I will not use or disclose any Proprietary Information or anything directly relating to Proprietary Information without the written consent of Vaxin, except as may be necessary in the ordinary course of performing my duties as an employee of Vaxin.

3.   <u>Ownership and Return of Materials</u>.  All materials (including, without limitation, documents, drawings, models, apparatus, sketches, designs, lists, and all other tangible media of expression) furnished to me by Vaxin will remain the property of Vaxin.  Upon termination of my employment, or at any time on the request of Vaxin before termination, I will promptly (but no later than five (5) days after the earlier of my employment's termination or Vaxin's request) destroy or deliver to Vaxin, at Vaxin's option, (a) all materials furnished to me by Vaxin, (b) all tangible media of expression which are in my possession and which incorporate any Proprietary Information or otherwise relate to Vaxin's business, and (c) written certification of my compliance with my obligations under this sentence.

4.   <u>Innovations</u>.  As used in this Agreement, the term "Innovations" means all processes, machines, manufactures, compositions of matter, improvements, ***inventions (whether or not protectible under patent laws)***, works of authorship, information fixed in any tangible medium of expression (whether or not protectible under copyright laws), moral rights, mask works, trademarks, trade names, trade dress, trade secrets, know-how, ideas (whether or not protectible under trade secret laws), and ***all other subject matter protectible under patent***, copyright, moral right, mask work, trademark, trade secret, or other laws.

5.   <u>Assignment of Innovations</u>.  I hereby agree promptly to disclose and describe to Vaxin, and ***I hereby do and will assign to Vaxin or Vaxin's designee my entire right, title, and interest in and to each of the Innovations, and any associated intellectual property rights, which I may solely or jointly conceive, reduce to practice, create, derive, develop, or make during the period of my employment with Vaxin, which either (a) relate, at the time of conception, reduction to practice, creation, derivation, development, or making of such Innovation, to Vaxin's business or actual or demonstrably anticipated research or development, or (b) were developed on any amount of Vaxin's time or with the use of any of Vaxin's equipment, supplies,***

*facilities, or trade secret information, or (c) resulted from any work I performed for Vaxin*.

      6.  <u>Cooperation in Perfecting Rights to Proprietary Information and Innovations</u>.  ***I agree to perform, during and after my employment, all acts deemed necessary or desirable by Vaxin to permit and assist Vaxin, at Vaxin's expense, in obtaining and enforcing the full benefits, enjoyment, rights, and title throughout the world in the Proprietary Information and Innovations assigned to Vaxin***.  Such acts may include, but are not limited to, execution of documents and assistance or cooperation (a) in the filing, prosecution, registration, and memorialization of assignment of any applicant patents, copyrights, mask work, or other applications, (b) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (c) in other legal proceedings related to the Proprietary Information or Innovations.

(*Id*. at 2-3 [emphasis added].)  Plaintiff testified that he signed the agreement with the intention "that Plaintiff's inventions would belong to Vaxin if Vaxin complies with the Agreement." (Doc. 56 ¶ 9.)

    After signing the agreement and during his employment, Plaintiff "invented the drug-vaccine duo (DVD; also known as RAPIT) platform technology [hereinafter DVD technology] when he worked at Vaxin." (Doc. 56 ¶ 8.)  This technology involves inducing a rapid and prolonged protective immune response against respiratory pathogens through the administration of an adenovirus.  (Doc. 76-1 ¶ 12.)  According to Dr. Tang:

      11.  Notably, Enright did not understand the significance of the DVD invention when he took the CEO position at Vaxin in 2008, and instructed Plaintiff repeatedly to cease working on the DVD project.

      12.  Plaintiff resisted Enright's mismanagement by explaining to him that the DVD invention would add value to Vaxin.  Plaintiff's explanation was not accepted by Enright at that time.

13.  Vaxin was in poor financial health during 2008-2011. Plaintiff deemed it crucial to file a provisional patent application on the DVD invention followed by publishing it.  Once the work is published in a prestigious scientific journal in support of a patent, the chance to win grants/contracts and attract investments would be significantly better.

14.  Plaintiff reported to the Vaxin Board in November 2010 that Plaintiff was willing to file a provisional patent application using personal money in order to protect this invention since CEO Enright was not supportive[.]

. . .

15.  The provisional patent application was filed in March 2011 using Plaintiff's personal money since no Board members showed any concern over 4 months and this patent would be forever lost if others should file similar findings.

16.  When Plaintiff attended a National Institutes of Health (NIH) study section as a reviewer during November 2011, Enright and Plaintiff had a meeting in Bethesda, Maryland.  Enright told Plaintiff adamantly that the DVD project had to be discontinued because his friends told him that the DVD work was meaningless and the results were published 40 years ago.

17.  Plaintiff concurred that the work would be meaningless if it was already demonstrated by others in the past; however, Enright must show the 40-year-old publication to validate his instruction.  Enright promised that he would bring the prior art to Plaintiff after the meeting.

18.  To date (3 years later), Enright still has not provided Plaintiff with the prior art described by him and his friends.  Evidence clearly illustrates that Enright provided Plaintiff with false information in support of a wrong instruction during the meeting in Bethesda.  If Plaintiff took Enright's wrong instruction on a wrong path, this DVD invention would have been buried alive.

19.  After the DVD work was published in two scientific journals against Enright's mismanagement and validated by two NIH contractors . . . , Enright changed his face and started praising the DVD work by saying it was "extremely important."  Enright no longer mentions his malicious attempts to assassinate the DVD invention . . . .

34

> 20.  In March 2012, Enright suddenly squeezed Plaintiff out of Vaxin without warning.  Enright told Plaintiff bluntly and coldly that Plaintiff had to leave Vaxin immediately without any rights on the DVD patent.  Enright will develop DVD by himself without the Inventor.

(Doc. 56 ¶¶ 11-20.)

In response to the provisional patent application for the DVD Technology filed by Dr. Tang,[11] Vaxin filed a complete patent application with the U.S. Patent and Trademark Office [USPTO] on March 21, 2012.  (Doc. 76-1 ¶¶ 14-15.)  In this application, Vaxin acknowledged that Dr. Tang was the inventor, but it claimed that it owned the rights to the DVD technology based on Dr. Tang's employment with Vaxin when he developed the DVD technology and based on his assignment of all rights to the DVD technology under the agreement.  (*Id*. ¶ 15.)

Plaintiff refused to sign a Declaration and Power of Attorney, which was required for the complete patent application that was filed for the DVD technology.  (*Id*. ¶ 16.)  In response, Vaxin filed a petition on July 17, 2012, and a renewed petition on October 16, 2012, seeking to prosecute the patent application on behalf of both itself and Dr. Tang pursuant to 37 C.F.R. § 1.47(b), which, at the time, permitted the assignee of an invention

---

[11]Defendant Enright testified that Vaxin did not know about the provisional patent application filed by plaintiff in March 2011.  Dr. Tang contends that Vaxin knew about the provisional patent application because he had told Board members that he was willing to file the provisional application in November 2010 and the Board members did nothing.  However, Dr. Tang does not allege that he informed the Board or Enright that he was actually going to file the provisional patent or that he had filed a provisional patent until after the fact.

to prosecute a patent application on behalf of all inventors in certain circumstances.[12]  At that

time, § 1.47(b) stated:

> (b)  Whenever all of the inventors refuse to execute an application for patent, or cannot be found or reached after diligent effort, ***a person to whom an inventor has assigned or agreed in writing to assign the invention, or who otherwise shows sufficient proprietary interest in the matter justifying such action, may make application for patent on behalf of and as agent for all the inventors***.

37 C.F.R. § 1.47(b)(emphasis added), *removed and reserved*, 77 Fed. Reg. 48776, Effective

Sept. 16, 2012); see also doc. 76-1 ¶ 16.  In support of its petition, Vaxin filed a copy of the

agreement and asserted that plaintiff had assigned to Vaxin his rights to the DVD technology,

that Vaxin otherwise had rights to the invention because plaintiff had developed it while he

was the Vice-President of Research of Vaxin, and that plaintiff was unwilling to sign the

---

[12]As part of the implementation of the Leahy-Smith Invents Act, the USPTO removed and reserved 37 C.F.R. § 1.47 and promulgated 37 C.F.R. § 1.46, which makes it easier for assignees or other persons with a sufficient proprietary interest in an invention to prosecute a patent application.  This rule change became effective September 16, 2012.  Because the patent application for the DVD Technology was filed on March 21, 2012, before this rule change, Vaxin's petition was filed pursuant to 37 C.F.R. § 1.47(b).

Declaration and Power of Attorney required for the patent application.[13]   (Doc. 76-1 ¶ 17; doc. 76-4 at 3.)

On or about December 11, 2012, the USPTO's Office of Patent Legal Administration [OPLA] entered a decision allowing Vaxin to prosecute the patent application on behalf of itself, as assignee, and Dr. Tang, the inventor.   (Doc. 76-1 ¶ 18; doc. 76-5 at 2.)   This decision stated:

> Petitioner [Vaxin] has shown that the non-signing inventor Tang has refused to join in the filing of the above-identified application.
>
> The application and papers have been reviewed and found in compliance with 37 C.F.R. 1.47(b).   This application is hereby <u>accorded Rule 1.47(b) status.</u>

(Doc. 76-5 at 2 [emphasis in original].)

The patent application for the DVD technology remains pending before the USPTO.

(Doc. 76-1 ¶ 22.)

---

[13]In response to defendants' Motion for Partial Summary Judgment, Dr. Tang argues: "Plaintiff refused to sign a Power of Attorney because Defendants refused to provide an estoppel letter.   After Enright signed an estoppel letter on September 5, 2014, Plaintiff rapidly signed a Power of Attorney the next day on September 6, 2014."   (Doc. 78 at 9 [citing Doc. 56]; *see also* doc. 56 ¶ 41 ["After Defendants showed flexibility in changing the attorney and provided Plaintiff with an Estoppel Letter . . . , Plaintiff signed the power of attorney . . . in 2014 . . . .].)   The "estoppel letter" states only that Dr. Tang's execution of a Power of Attorney form "will not estop [him] from asserting in [the instant action]" his ownership of the DVD technology.   (Doc. 56 at 28.)

## C.  DISCUSSION

Defendants contend that they are entitled to judgment as a matter of law on Dr. Tang's

Second Cause of Action to extent it is based on his allegation that they robbed plaintiff of his

right to the DVD technology.  They contend that the DVD technology at all times belonged

to Vaxin by virtue of plaintiff's agreement to assign all his innovations and proprietary

information to Vaxin.  Plaintiff argues that defendants' conduct breached the agreement.  He

contends, "When Defendants breached the Agreement by instructing Plaintiff to cease

working on the DVD project and failing to pay its patent costs, Defendants invalidated the

Agreement.   How can Defendants still hold the Agreement accountable after it was

invalidated by Defendants?"  (Doc. 78 at 5 [original emphasis omitted].)

> "[T]he question of who owns the patent rights and on what terms typically is
> a question exclusively for state courts."    *Jim Arnold Corp. v. Hydrotech Sys.*,
> 109 F.3d 1567, 1572 (Fed. Cir. 1997); *see also MyMail, Ltd. v. Am. Online,
> Inc.*, 476 F.3d 1372, 1376 (Fed. Cir. 2007).  However, this rule has exceptions:
> the question of whether contractual language effects a present assignment of
> patent rights, or an agreement to assign rights in the future, is resolved by
> Federal Circuit law.   "Although state law governs the interpretation of
> contracts generally, the question of whether a patent assignment clause creates
> an automatic assignment or merely an obligation to assign is intimately bound
> up with the question of standing in patent cases.  We have accordingly treated
> it as a matter of federal law." *DDB Techs., L.L.C. v. MLB Advanced Media,
> L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008)(citations omitted).

*Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832,

841 (Fed. Cir. 2009), *aff'd*, 563 U.S. 776 (2011).  Federal Circuit law holds that "the contract

language 'agree to assign' reflects a mere promise to assign rights in the future, not an

immediate transfer of expectant interests," and  the contract language "do hereby assign," as

38

in plaintiff's agreement,[14] "effect[s] a present assignment of [plaintiff's] future inventions to [defendant Vaxin]." *Id.* at 842 (citations omitted).  Pursuant to a present assignment, "Once the invention is made and an application for patent is filed, . . . legal title to the rights accruing thereunder would be in the assignee," in this case Vaxin, and "no further act would be required once an invention came into being; the transfer of title would occur by operation of law." *Id.* (citations omitted).

The plaintiff's agreement is a present assignment.  The agreement recites, "I hereby do and will assign to Vaxin . . . my entire right, title, and interest in and to each of the Innovations, and any associated intellectual property rights, which I may solely or jointly conceive, reduce to practice, create, derive, develop, or make during the period of my employment with Vaxin . . . .   (Doc. 76-3 at 3.)  Thus, when the DVD technology – an innovation under the agreement – was created by Dr. Tang while working for Vaxin, Vaxin

---

[14]With regard to the Assignment of Innovations the agreement at issue states:

I hereby agree promptly to disclose and describe to Vaxin, and ***I hereby do and will assign to Vaxin*** or Vaxin's designee ***my entire right, title, and interest in and to each of the Innovations, and any associated intellectual property rights, which I may solely or jointly conceive, reduce to practice, create, derive, develop, or make during the period of my employment with Vaxin***, which either (a) relate, at the time of conception, reduction to practice, creation, derivation, development, or making of such Innovation, to Vaxin's business or actual or demonstrably anticipated research or development, or (b) were developed on any amount of Vaxin's time or with the use of any of Vaxin's equipment, supplies, facilities, or trade secret information, or (c) resulted from any work I performed for Vaxin.

(Doc. 76-3 at 3 [emphasis added].)

automatically acquired all rights belonging to Dr. Tang, as the inventor, to patent the DVD technology.

Dr. Tang, however, contends that the assignment was voided or rescinded by defendants' failure in 2010 and 2011 to support his DVD technology. The court finds that this question requires the court to construe the agreement to determine whether Dr. Tang's present assignment agreement was conditional and such construction is a question of Alabama law.

> Alabama law construes contracts to give effect to the parties' intent and when a contract's terms are plain and unambiguous, there is no room for construction and the contract must be enforced as written. *See, e.g., Ex parte Conference America, Inc.,* 713 So. 2d 953, 956 (Ala.1998); *Hall v. Am. Indemn. Group,* 648 So. 2d 556, 559 (Ala. 1994). The general rule of contract law is that if a written contract exists, the parties' rights are controlled by that contract. *Mobil Oil Corp. v. Schlumberger,* 598 So. 2d 1341, 1345-1346 (Ala. 1992). The intent of the contracting parties is discerned from the whole of the contract. *Homes of Legend, Inc. v. McCollough,* 776 So. 2d 741, 746 (Ala. 2000). "It is well settled that where there is uncertainty and ambiguity in a contract, it is the duty of the court to construe the contract so as to express the intent of the parties." *BellSouth Mobility, Inc. v. Cellulink, Inc.,* 814 So. 2d 203, 216 (Ala.2001). The words of a clear and unambiguous assignment contract state the intentions of the parties and are binding as written. *See, e.g., Drummond Co. v. Walter Industries, Inc.,* 962 So. 2d 753, 780 (Ala. 2006).

*Lynn v. Romar Marina Club, L.L.C.*, Civil Action No. 07-0173-KD-C, 2009 WL 2066739, at *8 (S.D. Ala. July 8, 2009).

Dr. Tang testified:

> The Agreement . . . clearly spelled that any work pertaining to innovations had to be performed "at Vaxin's expense" . . . . When Enright instructed Plaintiff to cease working on DVD and refused paying for the provisional patent

40

application, Enright breached the Agreement[15] and Vaxin thus no longer owns the DVD patent rights.

(Doc. 56 ¶ 21 [footnote added].)

The only paragraph of the agreement that mentions "Vaxin's expense" is paragraph 6, entitled "Cooperation in Perfecting Rights to Proprietary Information and Innovations." (Doc. 76-3 at 3.)  In this paragraph, Dr. Tang "agree[s] to perform . . . all acts *deemed necessary or desirable by Vaxin* to permit and assist Vaxin, at Vaxin's expense, in *obtaining and enforcing the full benefits, enjoyment, rights, and title throughout the world in the Proprietary Information and Innovations assigned to Vaxin*."  (*Id.* [emphasis added].) Contrary to plaintiff's contention, this section does not require Vaxin to fund "any work pertaining to innovations" that Dr. Tang may have deemed necessary or desirable.  (doc. 56 ¶ 21).  Rather this section applies only to acts that *Vaxin* deems necessary or desirable to obtain and/or enforce the rights to those innovations that Dr. Tang has already assigned to Vaxin.  This language does not effect the assignment of the right to the innovation nor does it impose any condition on that assignment.  (*See* doc. 76-3 ¶¶ 5, 6.)

The court finds that plaintiff assigned all his rights to the DVD technology to Vaxin pursuant to the Employee Innovations, Non-Competition and Non-Solicitation Agreement

---

[15]The court assumes that Dr. Tang meant to allege that Enright, as an agent of Vaxin, breached the agreement.  As Enright is not a party to the agreement, his actions taken in his personal capacity would not constitute a breach of Vaxin's agreement.

and Enright's alleged conduct to discourage plaintiff's work on the DVD Technology in no way affected that assignment.

**D.  CONCLUSION**

Defendants' Motion for Partial Summary Judgment will be granted, (doc. 73), and plaintiff's Second Cause of Action, to the extent it states a claim based on defendants' theft of plaintiff's patent rights in the DVD technology, will be dismissed with prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, the court is of the opinion that:

1.  Defendants' Motion for Partial Dismissal of Second Amended Complaint, (doc. 63),  is due to granted in part and denied in part.  The Motion is due to be denied as to plaintiff's claim alleging theft of his patent rights to the DVD technology and denied as to the claims based on his guaranty of the RPC loan, which will be dismissed as moot.  The Motion to Dismiss is granted as to the remaining claims set forth in the Second, Third, and Fourth Causes of action and those claims, set forth in the First Amended Complaint that were not included in the Second Amended Complaint.

2.  Defendants' Renewed Motion for Partial Summary Judgment, (doc. 73), is due to granted.

3.  An Order granting in part and denying in part defendants' Motion for Partial Dismissal, (doc. 63), and granting defendants' Renewed Motion for Partial Summary Judgment, (doc. 73), will be entered contemporaneously with this Memorandum Opinion.

4.  Dr. Tang's only remaining claim alleges a cause of action for payment of his deferred salary and unpaid business expenses; defendants' counterclaims remain pending.

**DONE** this 9th day of March, 2016.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE